JAMES FITZ-GERALD, JR., V. H. WINSTON HULL, ET AL.

No. A-2738. Decided February 14, 1951.
Rehearing overruled April 4, 1951.
(237 S. W., 2d Series, 256.)

*Turner, Rodgers, Winn, Scurlock & Terry, Carlton R. Winn, Gerald FitzGerald and Lloyd Crosslin,* all of Dallas, for petitioner.

The pleadings and the evidence offered by the plaintiffs Hull and Green disclose that the oral agreement by which they seek to impose an oral trust upon the legal title held by the defendant Fitz-Gerald is nothing more than an express parol trust, and the Court of Civil Appeals erred in holding otherwise. Said court also erred in not holding that the evidence failed to support a fiduciary relationship between the plaintiffs and the defendant, or of other elements by which equity can impose a constructive trust upon the legal title held by the defendant, Fitz-Gerald. Morrison v. Farmer, 147 Texas 122, 213 S.W. 2d 813; McAlister v. Eclipse Oil Co., 128 Texas 449, 98 S.W. 2d 171; Kaiser v. Newsom, Com. App. 108 S.W. 2d 755; Elbert v. Waples-Platter Co., 156 S.W. 2d 146, Error refused W.M.

*Alvin R. Allison,* of Levelland, *Martin, Moore, Brewster & Dean, Jesse L. Martin, Leo Brewster* and *Beale Dean,* all of Fort Worth, for respondents.

While the pleadings and the evidence show that there was no agreement between the plaintiffs and the defendant that would create an express trust, the record shows that a constructive trust was created as a matter of law on the title of the property obtained and retained by the defendant because of the confidential relationship existing between plaintiffs and defendant through their long acquaintance and business transactions in that all agreed to acquire the property, the title to be taken in the names of all three, which agreement was breached by defendant taking title in his own name. And since all the parties agreed to be bound by their agreements and assume all obligations of all contracts, no intervening rights of third parties could be impaired. Whatley v. Cato Oil Co., 115 S.W. 2d 1205; Mills v. Gray, 210 S.W. 2d 985; Alexander v. Kennedy, 19 Texas 488, 70 Am. Dec. 358.

MR. JUSTICE GRIFFIN delivered the opinion of the Court.

In this cause the respondent herein, H. Winston Hull and Charles C. Green, as plaintiffs, sued the petitioner, James Fitz-Gerald, as defendant, in a statutory action of trespass to try

title to, and for an interest in, an oil and gas lease on certain described lands in Hockley County, Texas. For convenience, the lands will be called the Coble lands. Plaintiffs also alleged in detail a statement of their claims for recovery.

Generally, the allegations and proof show a joint venture entered into between respondents—plaintiffs below, and petitioner—defendant below—to acquire an oil, gas and other mineral lease on the Coble lands, in the event respondents' employer, Texas Gulf Producing Company, did not take such lease, and to develop and operate such lease as joint venturers, respondents owning one-half thereof, and petitioner owning the other one-half; expenses and losses to be shared equally. The petitioner took the lease from Coble in his own name in violation of the original agreement between the parties that it was to be taken in the names of all three. The evidence shows that respondents, as soon as they learned of the lease being taken in petitioner's name, began asking for a deed to their one-half interest, and never at any time acquiesced in, nor ratified, the act of petitioner in taking the lease in his own name. Petitioner kept putting off the request of respondents to convey their one-half of the lease, by telling respondents he was going ahead with his part of the joint venture, and as soon as he had completed certain arrangements necessary to develop the lease he would convey to respondents their one-half interest. This continued until two or three wells had been brought in on the lease by the operators to whom an undivided one-half interest had been assigned by petitioner, and then for the first time petitioner repudiated the original agreement and denied that respondents had any interest in the lease, and refused to convey any part of same to respondents. At the close of respondents' evidence, the trial court sustained petitioner's motion for an instructed verdict and judgment was entered denying respondents any recovery. The Court of Civil Appeals (232 S.W. 2d 93) held that the evidence was sufficient to raise a fact issue as to the existence of a constructive trust in said lease for the benefit of respondents and remanded the cause to the trial court for trial before a jury on the issues as set out in its opinion. Writ was granted by this Court. The Court of Civil Appeals has made a very detailed statement of the pleadings and the evidence, and we will not burden this opinion with a repetition of the same.

■ We must keep in mind that when an appellate court comes to consider the propriety of the trial court's having given an instructed verdict such Court must view the evidence in the

light most favorable to the party against whom the verdict was instructed. Stevens, et al v. Karr, 119 Texas 479, 33 S.W. 2d 725; White v. White, 141 Texas 328, 172 S.W. 2d 295.

These principles have long been recognied as applicable to cases of instructed verdict.

■ Under the previous decisions of this Court, it was not necessary for the plaintiffs to have secured a permit under the Texas Securities Act. Art. 600a, Vernon's Ann. Civ. Sts., as amended. This was conclusively decided by this Court in the case of Lewis v. Davis, 145 Texas 468, 199 S.W. 2d 146. That case was a suit by Lewis against Davis to recover an undivided one-half interest in certain oil and gas leases and other oil and gas rights, and for a division of profits. The trial court sustained an exception to the plaintiff's petition on the ground that he had plead no permit under Art. 600a as required of a dealer. This action was affirmed by the Court of Civil Appeals. This court reversed and remanded the cause, holding that the exception had been wrongfully sustained. After citing from previous decisions of this Court holding that the Securities Act was for the protection of purchasers against sellers of securities, and does not undertake to regulate purchases or to protect sellers against purchasers this Court discusses the 1941 amendment to the Securities Act, and concludes that such amendment does not "work changes in the general purpose of the Act and so to amend it as to require the procuring of permits or licenses by those who buy securities and the registration of securities for the protection of sellers against buyers." l.c., bot. 1st col., p. 149. Particularly applicable to the case at hand is this language:

"(13) It follows that if petitioner by reason of an agreement with or a relation to respondent became the owner or the equitable owner of a one-half interest in the oil and gas leases and other mineral interest acquired by respondent and by petitioner, he can maintain suit to establish and enforce his interest against respondent, even though neither petitioner nor respondent registered under the Securities Act. * * *"

This ground for an instructed verdict cannot apply so as to sustain the trial court's action.

■ Petitioner contends that the pleadings and evidence of the respondents show, as a matter of law, that they are seeking to enforce an express trust created by parol, which is specifically prohibited by Sec. 7, Art. 7425b. If such were the case, the action of the trial court in instructing the verdict must be

affirmed. A reading of the respondents' pleadings and of the Statement of Facts shows beyond any question that respondents seek to recover upon a constructive trust. All the allegations are to the effect that the agreement between the parties was that the purchase of the lease was to be made by the petitioner, but that the title was to be taken in the names of the respondents and the petitioner, and that respondents were to pay one-half the consideration and to be liable for one-half of all obligations of the lease and own one-half thereof; that the petitioner, in violation of the agreement, had taken title to the lease in his name alone (which fact was unknown to respondents until after the first well came in) ; and that for a time after respondents discovered that the title of the lease stood in the name of the petitioner alone, he recognized the original agreement and promised to make proper conveyances to respondents of their one-half interest, but that respondents did not agree to petitioner's holding title in his name, and continued to insist that their one-half interest be deeded to them. Under such state of facts when the petitioner took title to the property in his own name in violation of his promise, and of the original agreement made between the parties, he held the title to an undivided one-half interest for the benefit of, and in trust for, the respondents. This trust arose not because there was any agreement for the title to be taken in the name of petitioner, and the property to be held by him in trust for the respondents— as would be necessary to constitute an express trust—but, because under the facts, equity would raise the trust to protect the rights of respondents, and to prevent the unjust enrichment of petitioner by his violation of his promise and duty to the respondents to take title in the name of the three of them, and for their mutual profit and advantage.

As the Trust Act was originally passed by Acts, 48th Leg., R. S., Ch. 148, p. 232, Sec. 2 read:

"Sec. 2. *Definition of trust.* 'Trust', for the purposes of this Act, means an express trust only, and does not include so-called 'business trusts' ".

At the very next session of the Legislature the Texas Trust Act was amended in certain particulars. Sec. 2 then was made to read, as it did at the time of the transactions set forth in respondents' pleadings, and as it now reads:

"Art. 7425b-2. *Definition of trust.* 'Trust' for the purpose of this Act means an express trust only, and does not include (1) resulting or constructive trusts, (2) so-called 'Massachusetts

Trusts' or similar business trusts, (3) security instruments such as deeds of trust, mortgages and conditional sales contracts, (4) instruments wherein one or more persons are mere nominees for one or more persons without any disclosed beneficiaries and without any active trust duties. Acts 1943, 48th Leg., p. 232, ch. 148, sec. 2, as amended Acts 1945, 49th Leg., p. 109, ch. 77, sec. 1."

The only purpose the Legislature could possibly have had in thus amending Sec. 2, was to make more definite just what trusts were covered by the Act, and to state in so many words that the Act was not meant to apply to resulting or constructive trusts, to certain other business transactions generally known and denominated as "trusts", or whose legal effect was to create a "trust" in law or equity. To come within the limits and prohibitions of the Act, a certain state of facts must give rise to an express trust. We must, therefore, determine just what is an express trust under the terms of this Act. It was well-settled by our decisions rendered prior to the adoption of the Trust Act that the Statute of Frauds did not prevent the establishment of a parol trust in land. These decisions applied to express, resulting and constructive trusts equally. There was no appreciable difference in the end reached as to the form, name or character of the trust involved. We think the early case of James v. Fulcrod, 5 Texas 512, very clearly sets out that under our Statutes of Frauds then existing the establishment of a trust in lands could be proven by parol evidence. Chief Justice Hemphill, in declaring that trusts might be established by parol testimony, says:

"The 7th section of the English Statute of Frauds provides that all declarations or creations of trusts or confidences of any lands, tenements, or hereditaments shall be manifested or proved by some writing signed by the party who is enabled by law to declare such trust, etc.

"The 8th section declares that all trusts or confidences of land or tenements which arise or result by the implication or construction of law or are transferred by an act or operation of law shall be of the like force and effect as if the statute had not been made.

"The 9th requires that all grants and assignments of any trust or confidences shall likewise be in writing, or be utterly void and of none effect.

"These provisions, which have been adopted in most of the States of the United States, prohibit the creation of trusts of

lands unless manifested or proved by writing, or unless they result by implication or construction of law; *but under our laws, express and implied or constructive trusts, as to their creation, or rather proof, stand upon the same footing.* The special contract under which the former are raised, and the facts from which the latter result, may alike be proven and sustained by parol evidence." (Emphasis added.)

Until our Trust Act Statute of 1943 was passed, it continued to be true that no distinction between the kinds of trusts existed in regard to the proof of the existence of the trust by parol. The Trust Act of 1943, for the first time in Texas jurisprudence required that one of the kinds of trusts; to-wit, express trusts in real property must be created by some written instrument. Sevine v. Heissner, 148 Texas 345, 224 S.W. 2d 184 (1,2) p. 186.

In many early decisions of the Texas courts where the question raised had to do with the admissibility of evidence, we find some expressions as to the name given to the state of facts involved that an "express trust" was present. However, as said in James v. Fulcrod, supra, and Sevine v. Heissner, supra, prior to the adoption of the Trust Act the proof of express and implied or constructive trusts was subject to the same rules. Therefore, it was not necessary for the court to make any distinction between the various kinds of trusts in deciding the cases. This accounts for the language in some of the earlier cases with regard to "express trusts." A careful reading of all those cases will show (1) that a decision as to the kind and character of trust involved was not necessary to the decision of the case and (2) that in nearly all of such cases, the facts showed either that the title was taken in the name of one party for the benefit of the other party as a result of a previous agreement between the parties, or that there had been a ratification and acquiescence on the part of the complaining party of the act of the defendant in taking title in his own name.

Where it has been necessary to distinguish the various kinds of trusts, we believe that the Texas cases hold that an express trust "can come into existence only by the execution of an intention to create it by the one having legal and equitable dominion over the property, made subject to it." Mills v. Gray, 147 Texas 33, 210 S.W. 2d 985, 1. c. (1-4), p. 987.

42 Tex. Jur., p. 611, "Trusts", Sec. 10:

"Also, as distinguished from a trust arising from implica-

tions, an express trust arises 'either by express agreement or by direct and positive acts of the parties or by some writing or deed.' "

To the same effect are the following: Restatement, "Trusts," Vol. 1, p. 6, 1st par., Secs. 23-24, pp. 72-73; 54 Am. Jur., p. 22, "Trusts", Sec. 5; Wacasey v. Wacasey (Tex. Civ. App., 256 S.W. 1020, 1. c. (2-4), p. 1022, no writ history; McAlister v. Eclipse Oil Co., 128 Texas 449, 98 S.W. 2d 171, 1. c., 175 (3,4); First State Bank v. National Bank of Commerce (Tex. Civ. App.,) 99 S.W. 406, 1. c. (2), p. 409, writ refused; Lobban v. Weirhauser, (Tex. Civ. App.), 141 S.W. 2d 384, writ refused; Pomeroy Equity Jurisprudence, 5th Ed., Symons, Vol. 1, p. 206, Sec. 152; *Idem,* Vol. 3, p. 916, Sec. 987; Simmons v. Wilson, (Tex. Civ. App.), 216 S.W. 2d 847, 1. c. (4,5), p. 852, no writ history.

■ Regardless of the language of some of the early cases, the Trust Act specifically defines "express trusts" within the meaning of that Act. It provides:

"Art. 7425b-7. *Requisites of a trust.*

"An express trust may be created by one of the following means or methods:

"A. A declaration in writing by the owner of the property that he holds it as trustee for another person, or persons, or for himself and another person or persons; or

"B. A written transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person or persons; or

"C. A transfer by will by the owner of property to another person or persons as trustee for a third person or persons; provided that a natural person as trustee may be a beneficiary of any such trust.

"D. An appointment by a person having a power of appointment to another person as trustee for the donee of the power or for a third person; or

"E. A promise by a person to another person whose rights thereunder are to be held in trust for a third person; or

"F. A beneficiary may be a co-trustee and the legal *and* equitable title to the trust estate shall not merge by reason thereof. As amended Acts 1945, 49th Leg., p. 109, ch. 77, Sec. 3.

"Provided, however, that a trust in relation to or consisting of real property shall be invalid, unless created, established, or declared:

"1. By a written instrument subscribed by the trustor or by his agent thereunto duly authorized by writing;

"2. By any other instrument under which the trustee claims the estate affected. Acts 1943, 48th Leg., p. 232, ch. 148, Sec. 7." (Emphasis added.)

We see that the state of facts we have in the instant case does not come within any of the above "means or methods" whereby an express trust may be created under the terms of the Trust Act. Therefore, such Trust Act cannot apply to our case, and we do not have an express trust present.

By the express terms of Sec. 2 (Texas Trust Act, Art. 7425b) a constructive trust is not included within the terms of the Act.

■ Petitioner contends that there must be some fiduciary relationship between the parties to support a constructive trust, and that the facts of this case show that no such relationship existed.

"While a confidential or fiduciary relationship does not in itself give rise to a constructive trust, an abuse of confidence rendering the acquisition or retention of property by one person unconscionable against another suffices generally to ground equitable relief in the form of the declaration and enforcement of a constructive trust, *and the courts are careful not to limit the rule or the scope of its application by a narrow definition of fiduciary or confidential relationships protected by it. An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one.*" Sec. 225, 54 Am. Jur., "Trusts", p. 173. (Emphasis added.)

"The abuse of a confidential relationship by acquiring property through the employment of knowledge or interest obtained in such relationship constitutes a sufficient basis for equitable relief in the form of the declaration and enforcement of a constructive trust in respect of such property and in favor of the person wronged. The relationships of trustee and cestui que trust, principal and agent, client and attorney, and employer and employee, are striking, *but far from exclusive, examples of*

*confidential relationship within the meaning of this rule. * * *"*
Sec. 226, *Idem,* pp. 173-174. (Emphasis added.)

"An unfair transaction between a confider and a confidant or fiduciary, at least where the confidence is induced by a fiduciary relationship between the parties, gives rise to a constructive trust in respect of any unjust enrichment of the confidant or fiduciary. Where such a transaction is attacked, the burden of proof is on the confidant or fiduciary to establish the fairness of the transaction, and to this end he must fully disclose the facts and circumstances, and affirmatively show his good faith and the absence of pressure or influence on his part in the matter. However, it is not every relationship to which the term 'fiduciary' or 'confidential' can be applied with reason or plausibility, so as to raise a presumption of unfair dealings between the parties to the relationship. It is a question of the actual relationship between the parties that must be inquired into, and not whether the terms 'fiduciary,' 'confidential,' or 'trust' can, with some degree of reason, be applied to the relationship." Sec. 227, *Idem, pp.* 174-175.

*"The general rule is that a purchase, upon his own account or for his own benefit, by a fiduciary or confidant, of the property constituting the subject matter of the confidence or fiduciary relationship, in violation of the trust or confidence reposed in him, raises a constructive trust in favor of his principal or confider.* The rule is not confined to a particular class of persons, such as guardians, trustee, or solicitors, but is a rule of universal application to all persons coming within its principle. The principle of the rule is that no party can be permitted to purchase an interest where he has a duty to perform which is inconsistent with the character of a purchaser. * * *" Sec. 228, *Idem,* p. 175. (Emphasis added.)

See also Restatement, "Restitution", p. 64, Sec. 160, et seq., where in discussing Constructive Trusts it is stated:

"Sec. 160. Constructive Trust.

"Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.

"A constructive trust, unlike an express trust, is not a fiduciary relation, although the circumstances which give rise to a

constructive trust may or may not involve a fiduciary relation." *Idem,* p. 644.

*"Constructive Trusts*

"Sec. 1044. *Generally.* Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust. They arise when the legal title to property is obtained by a person in violation, express or implied, of some duty owed to the one who is equitably entitled, and when the property thus obtained is held in hostility to his beneficial rights of ownership. As the trusts of this class are imposed by equity, contrary to the trustee's intention and will, upon property in his hands, they are often termed *trusts in invitum;* and this phrase furnishes a criterion generally accurate and sufficient for determining what trusts are truly 'constructive.' An exhaustive analysis would show, I think, that all instances of constructive trusts properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source. Even in that single class where equity proceeds upon the maxim that an intention to fulfill an obligation should be imputed, and assumes that the purchaser *intended* to act in pursuance of his fiduciary duty, the notion of fraud is not invoked simply because it is not absolutely necessary under the circumstances; the existence of the trust in all cases of this class might be referred to constructive fraud. This notion of fraud enters into the conception in all its possible degrees. Certain species of the constructive trusts arise from actual fraud; many others spring from the violation of some positive fiduciary obligation; in all the remaining instances there is, latent perhaps, but none the less real, the necessary element of that unconscientious conduct which equity calls constructive fraud. (The constructive trust is imposed to prevent unjust enrichment.)

"Courts of equity, by thus extending the fundamental principle of trusts—that is, the principle of a division between the legal estate in one and the equitable estate in another—to all cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property; they can follow the real owner's specific property, and preserve his real ownership, al-

though he has lost or even never had the legal title, and can thus give remedies far more complete than the compensatory damages obtainable in courts of law * * *" Pomeroy, Equity Jurisprudence, "Constructive Trusts", Vol. 4, p. 93, Sec. 1044.

Also:

"Sec. 1053. 8. *Trusts ex Maleficio.*—In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust. The forms and variaties of these trusts, which are termed *ex maleficio* or *ex delicto*, are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrong-doer. * * *"*Idem*, p. 119, Sec. 1053.

Also, *Idem*, p. 140, et seq., Sec. 1056b.

Our courts have discussed constructive trusts, and have defined them as being raised by law. Lipsitz v. First National Bank, 293 S.W. 563, 1. c. 1st col., top 2nd col., p. 567:

"Being void, his acceptance of the money from the sheriff as the proceeds of the sale of the interest of these heirs in these lands, with the intention of denying to defendants in error the full satisfaction of their respective demands as measured by the judgment rendered in cause No. 4659, made him a trustee in invitum. The reception of this money created in favor of the defendants in error and Mrs. M. A. Anderson a constructive trust in Lipsitz. Constructive trusts are those which arise purely by construction or equity, and are entirely independent of any actual or presumed intention of the parties. Olcott v. Gabert, 86 Texas 121, 23 S.W. 985; Bouvier's Law Dictionary; Currence v. Ward, 43 W. Va. 367, 27 S. E. 329."

See also Texas Creosoting Co. v. Hartburg Lumber Co.

(Com. App.), 12 S.W. 2d 169, 1. c. 2nd col., p. 173; Simmons v. Wilson (Tex. Civ. App.), 216 S.W. 2d 847, no writ history; Restatement, "Trusts", Vol. 1, Sec. 1(c), p. 506; Scott on Trusts, Vol. 3, p. 3, par. 2315, Sec. 462. 1, et seq.

The case of MacDonald v. Follett, et al, 142 Texas 616, 180 S.W. 2d 334, we believe to be particularly applicable to the present suit. In 1943 MacDonald wanted to lease land belonging to the Muellers who were non-residents of Texas, and who were also Follett's clients. An oil and gas lease, expiring in 1937, on the Mueller lands was made to a nominee for MacDonald & Follett, who, with knowledge and consent of the Muellers, assigned to Follett an override of 1/32 royalty under the lease and then assigned the working interest under the lease to some oil companies, subject to the override. Follett immediately conveyed one-half of the override to MacDonald in accordance with their prior oral agreement. Thereafter, without the knowledge or consent of Follett, MacDonald secured renewal leases in April, 1937, and in assigning these leases to the oil operators, MacDonald reserved a 1/32 override in his name, as had been done previously, but MacDonald would not convey any part to Follett. The 1937 leases expired in April, 1940, and in October, 1938, MacDonald, by direct negotiations with the Muellers, procured top leases on the same land to become effective upon the expiration of the 1937 leases in April, 1940. MacDonald assigned these top leases to the same operators and he retained a 1/32 override royalty. Production was had under the top leases obtained in 1938. Follett claimed that MacDonald held one-half of such 1/32 override for the benefit of Follett; and that a constructive trust arose in favor of Follett the minute MacDonald secured the 1/32 override. The trial court gave judgment for the defendant on an instructed verdict as to the claimed interest in the 1/32 override, and the Court of Civil Appeals held the question as to whether or not MacDonald and Follett had entered into a joint venture in 1934, and if such joint venture was still in existence at the time the 1938 top leases were procured should be submitted to a jury, and on favorable findings, Follett might recover. There were other holdings, but on points not germane to the question here involved. The Supreme Court, in determining the cause, said:

"This is a suit in equity and in that realm the conduct of parties is judged by refined standards. No rules can be prescribed and no attempt should be made to formulate rules for the measurement of conduct by courts of equity, but that such conduct must be measured by standards exacting the utmost

fidelity between the parties is universally recognized. We experienced no difficulty in arriving at the conclusion that the facts above narrated, if found to be the true facts, establish that a relation of trust and confidence existed between Follett and MacDonald prior to the execution of the 1938 top leases. * * *"

It was claimed in MacDonald v. Follett that Follett had paid no part of the consideration for the 1937 leases, but the Court says: "While MacDonald paid the consideration therefor, he was not out any money on the transaction but, on the contrary, made money by the transaction."

Surely if a constructive trust is to be held to exist in top leases, about which there was no contention of an express agreement to hold such override for benefit of Follett, then we have no difficulty in holding that a constructive trust—under the evidence given in the trial of this case—could arise in favor of the respondents herein when the petitioner took the lease from Coble in his own name.

It is contended by petitioner that no fiduciary relation can exist during the negotiations leading up to the taking of the lease, and cites the case of Kaiser v. Newsom, (Tex. Civ. App.), 108 S.W. 2d 755, writ dismissed—correct judgment, as authority for such statement. In discussing the relationship necessary to support the raising of a trust relationship the Court says:

"In its broadest sense such a rule should always prompt the acts of parties in dealing with others; yet the 'fiduciary' relation created and recognized by law implies more than that. This close relation has its inception in the obligation of one to another when they are partners in a joint enterprise, between trustee and cestui que trust, guardian and ward, and in other instances not necessary to enumerate. Peckham v. Johnson (Tex. Civ. App.), 98 S.W. 2d 408, and authorities there cited."

Thus the Court recognized that had the agreement been as pleaded by the plaintiff there would have been a sufficient "fiduciary relationship" to sustain a constructive trust, but held that since no issue was given, or requested by plaintiffs, and since the burden rested upon them to establish the facts relied upon there was not such a relationship established in the case; and therefore, this point showed no reversible error. Also in Kaiser v. Newsom, the jury answered all the issues submitted favorably to the defendant. In our case, the respondents testified to

54

the facts necessary to establish the joint venture between the parties, petitioner and respondents.

■ The pleadings and proof show that the three parties agreed to enter into a joint adventure regarding this oil and gas lease and that each had a duty to perform to further the common interest. In carrying out this common interest each joint adventurer owed the highest duty to the other to so act as to further their joint interest, and each as to the subject matter of such adventure, was an agent of the other. The petitioner violated this duty in taking the title in his own name, and seeking to appropriate all the profits to his own use and benefit. Equity will force him to disgorge and to divide his gains with the other joint adventurers in accordance with their original agreement.

"The relationship between joint adventurers, like that existing between partners, is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise. This is especially true of those to whom the conduct of the transaction, or the property involved therein, is intrusted. Such a party will be regarded as a trustee and will not be permitted to enjoy any unfair advantage because of his possession or control of the joint property. The mere fact that he is intrusted with the rights of his coadventurers imposes on him the duty of guarding their rights equally with his own, and he is required to account strictly to his coadventurers; and if he is recreant to his trust, any rights they may be denied are recoverable." 30 Am. Jur. "Joint Adventurers," p. 695, Sec. 34.

See also same authority, Sec. 38, p. 697, and authorities cited in Note 9 of the text.

"Persons engaged in a joint adventure, *or about to assume such relationship, owe to each other the utmost good faith and most scrupulous honesty.*" Lind v. Webber, 36 Nev. 623, 134 P. 461, 135 P. 139, 141 P. 458, 50 L. R. A. (N. S.) 1046, Ann. Cas. 1916A, 1202. (Emphasis added.)

■ Restatement "Restitution", Sec. 194, p. 795, et seq, Sec. (2) declares the law to be:

"(2) A person who agrees with another to purchase property on behalf of the other and purchases the property for himself

individually holds it upon a constructive trust for the other, even though he is not under a duty to purchase the property for the other."

The comment under this Section 194 recognizes that conduct, such as is shown by the respondents' testimony in this case, may give rise to a constructive trust.

We think this case is covered by the case of Thompson v. Corbin, (Tex. Civ. App.), 137 S.W. 2d 157, no writ history, wherein it is said:

"Defendants' 3rd, 4th and 5th propositions are grounded upon a special exception that 'there are no allegations sufficient to impress a trust in favor of plaintiffs' in and to any of the mineral interests acquired by Thompson. It is to be observed from the pleadings that the consideration for the agreement consisted of the mutual promises above discussed. It is further alleged that the interests here involved were acquired under said agreement or arrangement and subject thereto. If so, the mutual promises and their execution entered into the consideration at the time the properties were acquired. Their joint undertakings were to be confined to operations in mineral interests and restricted to an area known as the East Texas oil field. We need not determine if the petition alleges an express or implied trust or a combination of both. Litigation arising out of similar joint adventure or partnership undertakings as we have here, have heretofore been recognized and sustained by our courts adversely to defendants' contention." Citing authorities.

While all the cases cited by the Court were cases of express trusts, and prior to the Texas Trust Act, the same reasoning will apply to a constructive trust which is expressly excluded from the terms of the Act.

See also Lanier v. Looney, (Tex. Civ. App.), 2 S.W. 2d 347, writ refused.

We also approve the holding of the Court of Civil Appeals that the facts alleged and proven by plaintiffs did not constitute laches as a matter of law.

Since the defendant had conveyed an undivided one-half interest in these properties to Thompson, et al, and was jointly operating this lease with Thompson, et al, we believe that plaintiff Green's conversation with Thompson relative to the

filing of the suit, and the damage that might be done thereby, was admissible on the question of the laches of plaintiffs.

Of course, our opinion, of necessity, is based upon the facts presented on this particular trial, and in the face of the trial court's instructed verdict, and is no attempt to determine facts on a final trial where all parties have introduced their testimony.

The judgment of the Court of Civil Appeals is in all things affirmed.

Opinion delivered February 14, 1951.

Associate Justice Wilson not participating.

Associate Justice Smedley dissenting.

MR. JUSTICE GARWOOD, concurring.

An initial approach to this case may not unnaturally be one unfavorable to the plaintiffs because of the vast discrepancy between the present money value of the property in controversy and the apparently insignificant money value of what the plaintiffs put into it. Another reason for such unfavorable impression is that the alleged agreement is proved only by oral testimony of those who have much to gain by their suit and concerns the ownership of land. However natural these predispositions and however relevant they may be to the fact-finders who will deteremine whether the plaintiffs' testimony is true, they do not bear analysis when one has to assume, as we do now, that the testimony is true.

Clearly the point of legal significance is not that the alleged agreement was oral, but that, being oral, it is said to establish an interest in land. The difficulty of the defendant here, however, is that not all oral agreements which go to establish such an interest are even presumptively suspect in our law. It seems that oral uses and uses imposed by the law on the basis of oral transactions were recognized as normal and valid institutions before the English statute of frauds was enacted. That measure required written evidence to establish contracts for the sale of land, as does our own subdivision 4 of Article 3995 of the civil statutes. It made the same requirement with regard to what, generally speaking, we now call "express trusts". But it left unchanged the legal situation as to uses or trusts which the law itself might impose upon the basis of oral transactions and without reference to the intent of the parties to create a trust. This being so, if there is question of whether the latter type

of trust shall or shall not be adjudicated to exist, I think we cannot rightly say that, legally speaking, we are considering the recognition of an exceptional or doubtful type of evidence any more than in the case of recognizing as valid proof the oral testimony of a witness that a traffic accident occurred. This seems to be the effect of our Texas decisions, which, since early times, have consistently held that trusts in land may be established by parol. Some of those decisions do, indeed, speak of situations like the present in terms of "express" trusts, but whether this expression was used discriminatingly or lightly, we undoubtedly held that subdivision 4 of the statute did not apply to trusts in land resting in parol. Certainly the court did not mean to imply that, while parol "express"trusts were valid, trusts could yet not be raised by the law itself upon the basis of a parol transaction. The validity of these trusts was accordingly no special exception to the general policy of our law. It was—for good or ill—simply one part of that policy like any other. It was not a special exception to subdivision 4 of the statute but simply something with which the subdivision is not concerned.

The new Trust Act changed the then existing situation in the state only to the extent of providing—in a manner somewhat different from the English statute—that "express" trusts must be evidenced by writing. And though, like the English statute, it did affirmatively exclude from its operation trusts established by operation of law, this precautionary disposition did not serve to make the latter class of trusts any more exceptional or suspect, when founded in parol, than did the English statute, but simply reaffirmed the law in this respect as it had existed since before the English statute. What the Trust Act did do, however, was to emphasize, more than did the English statute, that a writing is required only where the intent and purpose of the transaction were for one person to hold a legal title for the use of another person. This seems so plain from a full reading of Article 7425b-7, that even if our earlier decisions should be taken as defining an express trust in a broader way, the "express trusts" which they had in mind are not "express trusts" within the ban of the Trust Act. The agreement now before us plainly does not contemplate that any party was to hold all or part of the legal title of the mineral lease for the use of another. There was no intent to create a trust and therefore no express trust within the statutory provision. We need not say what changes in the agreement would have made it one for an express trust or discuss under what circumstances an oral agreement in the form of an express trust

may yet be enforcible as a constructive or resulting trust. It is enough to say that the agreement here did not purport to create an express trust.

Since, therefore, the oral agreement is not banned by any law, it should be enforcible either in damages or, as sought here, by suit to establish ownership through a constructive trust. While there is authority outside the state to the contrary, there is no less respectable authority, I think, that such a trust arises under the circumstances here involved. It is said that if A, who is no professional broker, orally volunteers on a day to purchase property for B upon B's credit and as B's representative, and B orally agrees, and on that same day A proceeds to make the purchase for himself and with his own funds, a constructive trust arises in favor of B, subject to his tender of the purchase price to A. Restatement, Restitution Sec. 194(2), Comments d and e; see also 2 Corbin, Contracts Sec. 401, n. 61. The point is not that the agency may rest on an oral transaction, but that the confidential relationship may arise in the same transaction, which is the basis of the suit, and at almost the same instant as the unfaithful purchase by the agent in his own name. It is said that the same rule applies whether the agent agrees to be agent for a principal and himself or merely for the principal. Restatement, supra, Comment e. I am unable to distinguish these situations from the instant one. I say the point in question is not that the "agency" may arise in parol. This is true, and yet I cannot at the same time escape the thought that if the agreement before us had been admittedly written and signed, few would have questioned the fact that a confidential relationship then and there arose. If so, is it logical to say it *could* not arise in an oral coffee-shop conversation, without at the same time invoking the statute of frauds, which, as stated, does not apply to the case? There is no statute requiring all confidential relationships to be evidenced by writing. Decisions such as the recent one in Berenson v. Nirenstein, 326 Mass. 285, 93 N. E. 2d 610, which emphasize the distinction between an agent who is a broker or agent by occupation and one who is not, seem somewhat arbitrary in so doing. The case named cites the above-mentioned section of the Restatement, and one may imagine that, but for earlier holdings of the same court, it would have rested the constructive trust **upon a broader ground.**

I agree fully with the part of the majority opinion supporting the holding that the Securities Act has no application.

Opinion delivered February 14, 1951.

MR. JUSTICE SMEDLEY, dissenting.

I respectfully dissent from the opinion of the majority, because I am convinced that respondents' suit, as made by the evidence offered by them, seeks to establish by parol evidence an express trust in relation to real estate, which is forbidden by Section 7 of the Texas Trust Act, Chapter 148, Acts Regular Session 48th Legislature, Vernon's Annotated Civil Statutes, Article 7425b-1-48.

The oral agreement upon which respondents Hull and Green rely and which they seek to enforce is, according to their testimony, this: It was agreed by the petitioner Fitz-Gerald on the one hand and respondents Hull and Green on the other that petitioner should procure for himself and respondents from the landowner Coble an oil and gas lease on seven tracts of land in Hockley County, the lease to be owned in undivided interests, one-half by petitioner Fitz-Gerald and one-half by respondents Hull and Green together, that the obligations of the contract should be in like proportions and that the lease should be taken in the names of the three, Fitz-Gerald, Hull and Green. The basis of respondents' suit is that petitioner breached the oral agreement by taking the lease in his own name and by declining to recognize respondents as owners of interests in it.

A principal fault in the majority opinion is that it avoids the prohibition of Section 7 of the Texas Trust Act by holding that the greement is not one for the creation of an express trust and follows that conclusion by the further conclusion that by reason of petitioner's breach of the parol agreement a constructive trust in respondents' favor will be implied. The first of these conclusions rests upon the testimony of respondents that the title to the leases was agreed to be taken in the name of all three of the parties. The opinion concedes that if the agreement had been that petitioner should procure the lease for the three parties, taking title in his own name, it would have been an agreement for an express trust and not enforceable. The case is turned by the majority on that very narrow distinction, about which more will be said.

But the opinion in holding that the oral agreement as testified to by respondents was not an agreement for or creating an express trust is contrary to our decisions. In Sachs v. Goldberg, 159 S. W. 92, application for writ of error refused, the agreement alleged, and to which the plaintiff testified, was that a lot should be purchased for the benefit of the plaintiff and the defendant, and that title should be taken in the names

of the plaintiff and the defendant as joint owners. The defendant bought the property and took the title in his own name. The court held, in an opinion by Chief Justice Pleasants, that the oral agreement created "an express trust" in favor of the plaintiff.

In McBride v. Briggs, 199 S. W. 341, the plaintiff and the defendant orally agreed to buy town lots and that title should be taken jointly. The defendant, in violation of the agreement, took title in his own name and the court held that the evidence established a trust in the plaintiff's favor. In so holding and discussing a question of limitation the court described the trust as an "express trust".

In Brotherton v. Weathersby, 73 Texas 471, 11 S. W. 505, there was testimony tending to prove that two parties agreed to buy a land certificate and locate it for the benefit of both, and the title was taken and the certificate was located in the name of one of them. The court, in discussing an objection to the trial court's charge, said: "If there was an agreement to buy the certificate and locate the land for the benefit of both, and if W. W. Brotherton paid his half of the purchase, then *an express or direct trust* was created." (Emphasis added.) The court directed attention to the fact that our statute of frauds did not require that "such trusts" should be evidenced by writing, and that it was well settled that they might be established in our courts by parol. See also Roach v. Crume, 41 S. W. 86.

The agreement in Gardner v. Randell, 70 Texas 453, 7 S. W. 781, was that Gardner should purchase an improved lot for himself and Randell, each to pay one-half of the purchase money and to hold equal interests in the property, and it was further agreed that Randell should have ninety days in which to pay Gardner his part of the purchase money advanced by Gardner. When Gardner bought and paid for the lot he took the title in his own name. It was held that the agreement was not a contract for the sale of land, and hence was not required by our statute of frauds to be in writing, but that by the express parol agreement a trust was created, since the provision of the English statute which prohibited parol trusts had not been incorporated in our laws.

Gardner v. Randell has frequently been cited as holding that an express trust is created by an oral agreement for the joint acquisition of land. See the authorities above cited and Johnston v. Johnston, 204 S. W. 469 and MacDonald v. Sanders, 207 S. W. 2d 155.

The argument, if valid, that it was unnecessary in the cases above cited to classify the trusts as express trusts, does not deprive those cases of their value as precedents. The statements in the opinions describing the trusts as express trusts were deliberately made and approved by judges who were not given to careless thinking or to loose expression. It may well have been that a full disclosure of the facts in the cases would have shown the want of proof of equities sufficient to support the implication of a constructive trust.

Reference has been made to the holding in the majority opinion that there is no express trust in the instant case because a part of the oral agreement, as shown by respondents' testimony, was that title should be taken in the name of the three parties to the agreement, with the statement or the clear implication in the opinion that but for this part of the agreement it would have been an agreement for an express trust. This is not a reasonable distinction. In each instance the substance of the oral agreement is that the defendant will acquire the property for the benefit of himself and the other parties. Assuming the validity of such agreements, when the defendant acquires the property he holds it for himself and for the other parties. All have the beneficial interests, whether the agreement is that the conveyance shall run in the names of all of the parties or that it shall run in the name of the defendant only. When the defendant denies the ownership or beneficial ownership of the other parties, he has breached the oral agreement as fully in the one instance as in the other. In both instances a trust for the benefit of the other parties could be decreed only by making proof of the oral agreement, and this is the very evil that Section 7 of the Texas Trust Act was intended to cure. Under the ruling made in the majority opinion, the prohibition of the statute could always be evaded by the inclusion in the testimony, as a part of the oral agreement, of a statement that title was agreed to be taken in the names of all of the parties to the agreement.

The opinion of the majority quotes portions of the text of American Jurisprudence which relate primarily, if not wholly, to cases in which there is a fiduciary relationship between the parties. The quoted text is not applicable to the instant case, in which there is no evidence of such a relationship. The opinion makes no reference to the part of the text which deals with the very question in this case. It is as follows:

"Agreement to Purchase for Another.—The general rule is that where the statute of frauds requires trusts to be created

or evidenced by writing, an oral agreement or promise to purchase land for another's benefit cannot be enforced as an express trust, at least where the promisee at the time of the agreement or promise had no interest in the land and furnished no portion of the purchase price. *The rule is applicable to an agreement to purchase for the joint benefit of the purchaser and another,* and to an agreement to purchase property and thereafter convey to another an interest therein, or to divide it with another. In the absence, however, of any requirement in the statute of frauds that an express trust be created or evidenced by writing, an oral agreement to buy land for another, for the joint acquisition of lands, or to convey to another an interest in, or to divide, lands to be acquired may be given effect as an express trust, although there is authority to the effect that agreements to acquire title to land and turn it over to another, or divide it with another, are merely contracts for the sale of land, and not contracts creating trusts, and so are unenforceable." 54 Am. Jur., p. 59, Sec. 48.

Section 7 of the Texas Trust Act is in substance the same as Section 7 of the English Statute of Frauds, and we have in Section 7 of our Trust Act the same requirement as that of the English Statute of Frauds and of the statutes of many other states that trusts affecting lands must be created or evidenced by writing. The instant case falls within the first part of the above quotation from American Jurisprudence, which announces the general rule to be, where there is such a statute, that an oral agreement to purchase land for the joint benefit of the purchaser and another cannot be enforced.

The elaborate note in 42 A. L. R., pp. 10-126, entitled "Oral Promise to Buy Land for Another" contains on page 63 the following statement of the general rule, with citation of many authorities:

"Ordinarily, oral agreements to join in the purchase of land do not give one party any enforceable right to claim the benefit of the purchase by the other. Viewed as agreements to transfer an interest in the land to be acquired, they are clearly within the Statute of Frauds; nor can they be given effect as a promise to hold for the benefit of another, save in those jurisdictions where express trusts need not be evidenced by writing. Except in those jurisdictions, therefore, the complainant cannot obtain relief unless he can establish a resulting trust, growing out of the use of his money in making the purchase, or a constructive trust, based upon the fraud of the defendant in procuring the title, or the abuse of some confidential

relationship. The mere breach of the agreement that the complainant may share in the benefit of the purchase is not fraud in obtaining the title, and so will not give rise to a constructive trust."

On the same page, 63 of 42 A. L. R., the rule in Texas, according to the decisions made prior to the enactment of the Texas Trust Statute, is thus stated, with citation of the Texas cases:

"But in Texas and West Virginia it has been held that an oral agreement between two or more persons for the joint acquisition of land is not a contract for the sale of land within the Statute of Frauds, but one creating a trust, and hence enforceable where the local Statute of Frauds does not require trusts to be evidenced by writing."

It is clearly shown by the foregoing quotations that an oral agreement of two or more persons for the joint acquisition of land is one creating an express trust, and that the enforcement of such an agreement is forbidden by our statute, Section 7 of the Trust Act.

The opinion of the majority is erroneous for the further reason that there is no proof in the statement of facts of such equities in respondents' favor as would warrant the use of the constructive trust to award respondents an interest in the realty. The principal and primary use of the constructive trust is as a remedy to restore to the plaintiff property of which he has been deprived. This is so generally true that the constructive trust is treated by the American Law Institute in the Restatement of the Law of Restitution rather than in the Restatement of the Law of Trusts. "In most cases where a constructive trust is imposed the result is to restore to the plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property." Restatement of the Law of Restitution, Subdiv. d., Sec. 160, Ch. 9, p. 643. The constructive trust is imposed to prevent the unjust enrichment of one at the expense of another, and for the purpose of restoring the status quo. See Scott on Trusts, Vol. 1, Sec. 44, p. 251, and see Corbin on Contracts, Vol. 2, Sec. 401, pp. 372-373, where the author says: "Courts

of equity used the device of a constructive trust, generally to compel such restitution, but sometimes to enforce the express promise of the defendant. When consciously used for the latter purpose, it may seem to involve a judicial disregard of the express words of the statute; but when used to compel restitution only it is within the express words of the statutory exception, and refusal of relief would be in disregard of the statute." Scott says: "Dean Pound has spoken of the use of the constructive trust as affording 'specific restitution of a received benefit in order to prevent unjust enrichment.'" Scott on Trusts, Vol. 2, Sec. 462.1, p. 2316.

This suit is not one for restitution. Respondents were not the owners of the land involved herein or of any interest in the minerals in the land. Their testimony shows that they paid no part of the consideration for the oil and gas lease and made no payment for expenses of drilling and equipping the wells, and had no part in the financing of the wells. Petitioner did not drill or cause any of the 31 wells to be drilled by the use of his own funds, but he performed or caused to be performed the obligations of the lease and obtained the development of the property to the extent of 31 producing wells through contracts that he made with Thompson, Carr and Forster and Stanolind Oil Purchasing Company. Most of the funds for drilling and equipping the wells, in the total amount of a million dollars, was obtained from the company last named on notes executed by petitioner Fitz-Gerald, Thompson, Carr and Forster, and secured by deed of trust conveying the leasehold estate. Most of the wells were drilled after November 23, 1947, at which time respondents were told by petitioner that they had no interest in the property. Respondents stood by for 14 months before this suit was filed and saw the drilling and completion of the producing wells by the expenditure of the funds procured by the notes executed by petitioner, Thompson, Carr and Forster, and they now assert ownership of an undivided one-fourth interest in the property, alleging a willingness to take it subject to the deed of trust and to the rights of Thompson, Carr, Forster and the Stanolind Oil Purchasing Company. They offer to become liable on the notes and deed of trust executed to Stanolind Oil Purchasing Company and on the operating agreement with Thompson, Carr and Forster, although of course they could not make themselves in this suit parties to those instruments, the Stanolind Company and Thompson, Carr and Forster not being parties herein, and their offer could not in any way relieve petitioner or Thompson, Carr and Forster of the obligations which they have incurred.

The foregoing facts, established by the testimony of respondents and the instruments in evidence, negative the existence of equities in respondents' favor that would justify the use of the constructive trust; and they reveal that the suit is in substance nothing more than one for the specific performance of an oral agreement in relation to real property. In other words, the facts in evidence reduce the suit to one merely for the enforcement by parol evidence of a trust in relation to real property, and the case comes directly and literally within the prohibition of Section 7 of the Texas Trust Act.

The texts that have been cited recognize that in certain defined exceptional cases a constructive trust may be implied, even though it will result in enforcing an oral trust contrary to the express words of the statute. It may be implied under certain circumstances to compel restitution. See Corbin on Contracts, Vol. 2, Sec. 401, pp. 372-373. The instant case, as has been said, is not one for restitution.

Another exception is that a constructive trust may be used as a remedy where the promissor has procured by actual fraud the transfer of land to him. Scott on Trusts, Vol. 1, Sec. 44, p. 250; Corbin on Contracts, Vol. 2, Sec. 401, p. 373; Restatement of the Law of Restitution, Ch. 10, Sec. 182, p. 730; Note 42 A. L. R. pp. 10, 63. The breach of the oral promise is not fraud in obtaining the title and so will not give rise to a constructive trust. Corbin on Contracts, Vol. 2, Sec. 401, pp. 373, 375, and cases cited; Note 42 A. L. R. pp. 10, 16, 63. If it were so regarded the statute prohibiting parol trusts would be of no effect. In this case there is no evidence tending to prove that petitioner procured the lease by fraud or that he was in any way guilty of fraud. Respondents' testimony is evidence that he breached the parol agreement.

Another exception permits, under proper circumstances, the use of the constructive trust as a remedy in cases where there is an existing fiduciary relationship and property is acquired in violation of the duty as a fiduciary. The use of the constructive trust in such cases is permitted, even though in its effect it contravenes the statute which prohibits parol trusts. Mills v. Gray, 147 Texas 33, 40, 210 S. W. 2d 985; Thompson v. Corbin, 137 S. W. 2d 157; Scott on Trusts, Vol. 1, Sec. 44, p. 250, Sec. 44.2, p. 253, Vol. 3, Sec. 462, p. 2314; Corbin on Contracts, Vol. 2, Sec. 401, pp. 377-378; Restatement of the Law of Restitution, Ch. 10, Sec. 182, pp. 730-731; Restatement of the Law of Trusts, Vol. 2, Ch. 12, Sec. 439, pp. 1341-1342. The fiduciary relation-

ships to which the exception applies are such as executor and heir or devisee, guardian and ward, principal and agent, attorney and client, parent and child, partnership, joint adventure. Acquaintance or friendship is not such a relationship. Elbert v. Waples-Platter Company, 156 S. W. 2d 146, 150; Rubin v. Midlinsky, 321 Ill. 436, 152 N. E. 217; 65 C. J. Sec. 228, p. 482. Without setting out the testimony, it is sufficient to state that according to the evidence in the record petitioner Fitz-Gerald and respondens Hull and Green were acquaintances and friends, not intimate friends, that no fiduciary relationship existed, and that they were men of about equal age, education and business experience.

It is urged by respondents that there was a fiduciary relationship because the oral agreement was that the leased premises would be developed and operated as a joint adventure. But there was no existing fiduciary relationship. There was merely an oral agreement that the parties would engage in a joint adventure if and when the lease was acquired. As said in Kaiser v. Newsom, 108 S. W. 2d 755, 758; "The principle discussed last above applies only after the relation has been created, either by acts of the parties or by decree of court, and cannot be relied upon pending a negotiation, which, if culminated, will create the fiduciary relation."

The opinion of the majority assumes the existence of a joint venture and a fiduciary relationship between petitioner and respondents beginning at the time when the oral agreement for the acquisition of the lease was made. The record lends no support to that assumption, for the oral agreement to which respondents testified contemplated and intended that the parties would engage in a joint venture in the development and operation of the lease in the event that and after the lease was acquired. The facts of this case bring it within the rule announced in the quotations set out above from 54 American Jurisprudence, page 59, Section 48, and 42 A. L. R., page 63.

The majority opinion relies primarily on MacDonald v. Follett, 142 Texas 616, 180 S. W. 2d 334, to support the conclusion that a constructive trust may be imposed upon the realty involved herein because of a fiduciary relationship between the petitioner and respondent. That decision, by reason of a decided difference between the facts of the two cases, is not applicable to the instant case.

That case held that the evidence raised an issue of fact as

to the existence at the time renewal oil and gas leases were procured in 1937 and again in 1938 of a relation of trust and confidence between MacDonald and Follett. The testimony disclosed that as early as 1932 MacDonald and Follett entered into an agreement for the acquisition by them together and personally of undivided interests in overriding royalties under oil and gas leases to be negotiated for MacDonald's oil company and Follett's clients, the landowners, named Mueller. Leases on the land were first procured pursuant to this agreement in 1934 and out of them a 1/32 overriding royalty was at the same time conveyed by the lessee to Follett, who conveyed a one-half interest in that royalty to MacDonald. The land belonged to Follett's clients and, as pointed out in the court's opinion, MacDonald's interest was obtained only through his dealings with Follett. The court in its opinion refers to the ownership of the overriding royalties and the relation between MacDonald and Follett in their ownership as a "status existing".

With that status existing and with the leases about to expire in 1937, it was, according to Follett's testimony, agreed between him and MacDonald that the two would work together so that all parties would be protected by renewal of the leases and the renewal of the overriding royalties under the leases, and Follett suggested that MacDonald talk to the lessees about a renewal and try to get a fair price for the Muellers, the landowners, and communicate the offer to him, Follett, so that he could submit it to the Muellers. According to Follett's testimony, Macdonald, without Follett's knowledge, went to Iowa and negotiated with the Muellers and procured the renewal of the leases with assignment of the overriding royalties to MacDonald, but never conveyed any interest in the overriding royalties to Follett. In the same way other renewal leases were procured by MacDonald in 1938 before the expiration of the 1937 leases, and a 1/32 overriding royalty under the new leases was retained by MacDonald.

The foregoing statement of the facts and evidence is sufficient without extended comment, to show the vast difference between that case and this case. There the parties over a period of several years were engaged in negotiations and agreements for procuring and renewing oil and gas leases to be executed on the Mueller land, in order that they might acquire and own together overriding royalties under the leases. They engaged in negotiations, agreements and correspondence in carrying out their plans, and together owned the overriding royalties under the leases for several years before MacDonald procured the

execution of the renewal leases and the assignment of the overriding royalties under them. There was an existing close association and a relationship of confidence, according to Follett's testimony. In the instant case, as has been said, there was no proof of a pre-existing confidential relationship between petitioner and respondents. The evidence is that they were acquaintances and friends, not intimate friends, and that they were of equal age, education and business experience. In the instant case there was no "existing status" in relation to the property at the time when the oral agreement was made, and this is not a case in which one cotenant or joint owner procured for himself the renewal of a right or interest which he and his associates then jointly owned.

The case made by the evidence in the record comes within no recognized exception permitting the use of the constructive trust to avoid the statutory prohibition of parol trusts. The case is a striking example of what the statute, Section 7 of the Texas Trust Act, was intended to prevent, that is, the subjecting of land titles to attack and change by unaided testimony to an oral agreement, and thus destroying the security of titles. In this case, there having been an instructed verdict, the Court correctly assumes the truth of respondents' testimony that the oral agreement was made, and then the majority of the Court, induced apparently by its belief that petitioner ought to perform the oral agreement, resorts to the constructive trust to compel him to do so. But this use of the constructive trust in effect nullifies the statute when the Court is under the duty to give effect to it. If under the facts of this case the prohibition of the statute can be avoided, then it is difficult to conceive of any case in which effect can be given to that part of the statute, and if the opinion of the majority stands, the law of this state with respect to parol trusts in realty will be substantially the same as it was before the enactment of the Texas Trust Act.

Other contentions, not without merit, are presented in the application for writ of error, but they are not discussed because I am convinced that the case is governed by the proviso of Section 7 of the Trust Act.

The judgment of the Court of Civil Appeals should be reversed and the judgment of the District Court affirmed.

Opinion delivered February 14, 1951.

Rehearing overruled April 4, 1951.